

**CONFIDENTIAL COMMUNICATIONS INTERNATIONAL, LTD.**

# Transcript of the Testimony of
# Charles Edward Bain, M.D.

**Volume:** I

**Date of Deposition:**
June 7, 2011

**Case:** Herman J. Chavez v. Marten Transport, Ltd., et al.

Confidential Communications Int. Ltd.
Phone: 713.365.0777
Fax: 713.365.0808
Email: scheduling@recordsdiscovery.com
Internet: www.recordsdiscovery.com
1955

**EXHIBIT 2**

Charles Edward Bain, M.D.

Page 13

1  mean, that's up to them.
2    Q.  But do you understand that in a civil case,
3  when a plaintiff has alleged that a defendant has done
4  something in a manner that is negligent so as to cause
5  harm to them or injury, that the civil defendant is
6  defending the case by arguing that they, A, were either
7  not negligent or, B, did not cause the harm, or both; do
8  you understand that?
9        MR. VALDEZ:  Object to the form.
10       THE WITNESS:  No, I don't.
11   Q.  You don't concern yourself with the negligence
12  aspect?
13   A.  No.
14   Q.  And you don't concern yourself with the
15  plaintiff's theories of the case?
16   A.  I will look at the diagnoses that have been
17  rendered that are being causally -- the allegation that
18  they're causally related.  I do not -- I certainly look
19  at those and consider those.
20   Q.  Has your testimony ever been excluded under
21  Daubert or Kumho Tire or any other standard that's
22  applicable to expert witnesses?
23   A.  Yes.
24   Q.  How many times?
25   A.  About 12 times.

Page 14

1    Q.  Do you keep a record of those 12 orders?
2    A.  No.
3    Q.  When was the last time your opinion has been
4  rejected by a court?
5    A.  Well over a year ago.
6    Q.  Has your opinion ever been rejected in federal
7  court?
8    A.  Yes.
9    Q.  How many times?
10   A.  Once, to my knowledge.
11   Q.  When was that?
12   A.  2006, 2007.
13   Q.  What federal court?
14   A.  It was one of the districts in Louisiana.
15   Q.  What did the court determine?
16   A.  I did not have enough information to assist the
17  trier of fact.
18   Q.  Have you ever been deemed by any court to be
19  unqualified to give injury causation analysis opinions?
20   A.  No.
21   Q.  And my understanding from your report is that
22  you claim your qualifications to give injury causation
23  analysis are based in your medical training, your
24  engineer education and some posteducation courses?
25   A.  In part, yes.

Page 15

1    Q.  Have you ever been a mechanical engineer?
2    A.  No.
3    Q.  Have you ever been a professional engineer?
4    A.  No.
5    Q.  When was the last time you practiced medicine?
6    A.  Clinical medicine --
7    Q.  Yes.
8    A.  -- was in 2003.
9    Q.  Have you ever worked as an accident
10  reconstructionist?
11   A.  Yes.
12   Q.  Have you ever been certified by any accident
13  reconstruction boards or organizations?
14   A.  Yes.
15   Q.  Which one?
16   A.  ACTAR.
17   Q.  Are you still, currently certified by ACTAR?
18   A.  Yes, I think I am.  You have to get 80 hours of
19  continuing education credits every five years, and I have
20  got my 80 hours.  I'm trying to -- exchanging e-mails
21  with them because I think my certification was due
22  actually this month, I believe, but I have completed it,
23  and I'm waiting to hear back from them that they have
24  accepted the CE credits.
25   Q.  You didn't reconstruct this accident, did you?

Page 16

1    A.  Yes.
2    Q.  You did?
3    A.  Yes.
4    Q.  Do you consider yourself to be an accident
5  reconstructionist in this case?
6    A.  Yes.  I did do a reconstruction.
7    Q.  You prepared a diagram?
8    A.  No.
9    Q.  Did you go to the scene?
10   A.  Not physically, no.
11   Q.  Did you inspect the tractor-trailer?
12   A.  No.
13       MR. JARAMILLO:  Mr. Valdez --
14       We can go off the record.
15       MR. VALDEZ:  Certainly.
16       (Discussion off the record.)
17   Q.  Do you have a billing sheet for this case?
18   A.  I have given you billing records in that disk
19  that you have.
20   Q.  Right.  I don't have a computer, and I can't
21  open this disk, so I need to --
22       MR. VALDEZ:  What would you like, David?
23  And I'll have it printed for you.
24       MR. JARAMILLO:  I just need his
25  current --

4 (Pages 13 to 16)

Herman J. Chavez v. Marten Transport, Ltd., et al.

1955

Charles Edward Bain, M.D.

| Page 45 | Page 47 |
|---|---|
| 1  Q. Why not?<br>2  A. I just received it this morning.<br>3  Q. Who gave it to you?<br>4  A. Lynn did.<br>5  Q. So for the first time this morning, you<br>6  reviewed the MRI taken of Mr. Chavez's lumbar and<br>7  cervical spine, taken subsequent to the incident in<br>8  December of 2006?<br>9  A. That's right.<br>10 Q. Do you plan on giving some opinion based upon<br>11 that MRI study that is different or apart from what's<br>12 stated in your February 14th, 2011 report?<br>13 A. No.<br>14 Q. Do you plan to reference anything about that<br>15 MRI study and your review of that MRI study to support<br>16 the opinions that you've stated in your report?<br>17 A. The studies are even interpreted by a<br>18 radiologist, and my quick look at the films shows that I<br>19 previously -- the interpretation by the radiologist, I<br>20 don't, at the first look at that, see anything that's<br>21 different.<br>22 Q. You're not a radiologist though?<br>23 A. No, I'm not.<br>24 Q. Are you qualified to render an opinion contrary<br>25 to what the radiologist has concluded with respect to | 1  didn't get it in there, so I brought the article.<br>2  Q. This article is not included in your<br>3  bibliography that's attached to your report, is it?<br>4  A. That's correct.<br>5  Q. And prior to today, you never gave it to<br>6  counsel to give to me?<br>7  A. That's right.<br>8      MR. JARAMILLO: Go ahead and mark that as<br>9  Exhibit 4.<br>10     (Whereupon, Exhibit 4 was marked<br>11     for identification.)<br>12     MR. VALDEZ: Is that your only copy,<br>13 doctor?<br>14     THE WITNESS: Yeah, it is.<br>15     MR. VALDEZ: We'll make a copy for you.<br>16 Q. The next file has the deposition notice and<br>17 some jury instructions. You're not a lawyer, right?<br>18 A. No, I'm not.<br>19 Q. Who gave you this?<br>20 A. Robert did.<br>21 Q. And who highlighted it?<br>22 A. Robert.<br>23 Q. Why were you given this if you're not a lawyer?<br>24 A. He just wanted me to be aware of the legal<br>25 definitions. |

| Page 46 | Page 48 |
|---|---|
| 1  what a film says or does not say?<br>2      MR. VALDEZ: Object --<br>3  Q. Shows or does not show rather?<br>4      MR. VALDEZ: Excuse me. Object to the<br>5  form.<br>6      THE WITNESS: I have done that in the<br>7  past.<br>8  Q. But in this case, you don't disagree with any<br>9  of the radiology reports that you've reviewed?<br>10 A. I've only looked at the two films so far, and<br>11 no. The answer is no at this point.<br>12 Q. And the two MRIs that you've looked at this<br>13 morning, that you looked at this morning for the first<br>14 time, are MRIs of, one, the cervical spine and, two, the<br>15 lumbar spine?<br>16 A. Yes.<br>17 Q. Could you hand me the small section of your<br>18 file that you have in front of you there?<br>19     MR. VALDEZ: This one right here?<br>20     MR. JARAMILLO: Yes.<br>21 Q. You have an article here called "Are first-time<br>22 episodes of serious LBP associated with new MRI<br>23 findings?" What is this article?<br>24 A. Just what it states. It -- I haven't included<br>25 that in my bibliography, and I was planning to, but | 1  Q. You told me earlier that you don't concern<br>2  yourself with the negligence/liability portion of a case;<br>3  isn't that true?<br>4  A. I don't know if I answered in that way. In<br>5  this case, there is an issue of liability concerning who<br>6  hit who, and I am going to give an opinion in that<br>7  regard, but I'm not a lawyer, and to ask me the legal<br>8  definition for those terms, I would reference documents<br>9  like that.<br>10     MR. JARAMILLO: Go ahead and mark these<br>11 as Exhibit -- Where's 5?<br>12     COURT REPORTER: You're okay. You did 5<br>13 out of order.<br>14     MR. JARAMILLO: That's right.<br>15 Q. This is your only copy, I take it?<br>16 A. That's right.<br>17 Q. So the jury instructions we'll mark as Exhibit<br>18 6.<br>19     (Whereupon, Exhibit 6 was marked<br>20     for identification.)<br>21 Q. What is this document?<br>22 A. I don't add up the billings, invoices. My<br>23 staff do that for me.<br>24     MR. JARAMILLO: So this summary we'll<br>25 mark as Exhibit 7. |

12 (Pages 45 to 48)

Page 61

1  although I will -- Mr. Valdez, I'm going to have to
2  object to any speaking objections.  You need to object to
3  the form or to the foundation, and if the form of my
4  question is poor, then the attachment of the exhibit and
5  everything else will be worthless unless I ask for
6  clarification.
7           MR. VALDEZ:  Very well.
8      Q.  What I believe you've testified to, doctor, is
9  that the section of your report on the biomechanics of
10 DDD, which is short for degenerative disc disease --
11          Correct?
12     A.  Yes.
13     Q.  -- that the section on the biomechanics of DDD
14 was not actually created and typed specific for this
15 case?
16     A.  Well, I insert it specifically into my report.
17     Q.  Sure.
18     A.  But I have a literature review that I have done
19 that I continuously update.
20     Q.  You were able to pull it from another document
21 and --
22          MR. VALDEZ:  And please --
23     Q.  I did interrupt you.  Go ahead.
24          MR. VALDEZ:  Please excuse me.
25     Q.  I'm sorry.

Page 62

1           MR. VALDEZ:  Let the witness answer.
2      Q.  Finish your answer.
3      A.  I'm continuously reading in this area and
4  continuously updating this literature review, and when I
5  have a case involving degenerative disc disease, I use
6  the current version of the literature review that I have
7  in a document, and I will include that as part of my
8  report.
9      Q.  Do you have that saved on your computer
10 somewhere?
11     A.  Yes.
12     Q.  Is it under a folder?
13     A.  Yes.
14     Q.  What's the folder called?
15     A.  I don't know.
16     Q.  Is it called "Biomechanics of DDD" or something
17 like that?
18     A.  I'm sure it's got DDD in it, but I don't recall
19 the actual name.
20     Q.  And this is your ongoing review of medical
21 literature with respect to the biomechanics of DDD?
22     A.  My ongoing review of both medical and
23 biomechanical literature on DDD.
24     Q.  Did you do any case-specific review of the
25 medical literature to add to your discussion of the

Page 63

1  biomechanics of DDD for this case?
2      A.  In part, yes.  That paper I have come across
3  which I've given you a copy of, I'll be including that in
4  my future DDD literature review.
5      Q.  Other than Exhibit 4, which is not included in
6  your bibliography in your February 14th, 2011 report and
7  that you provided for the first time today --
8           And for the record, I'm going to object
9  to the use of this document as being untimely submitted.
10          Other than Exhibit 4, is there any
11 specific literature review or specific literature
12 analysis that you completed for this case on the
13 biomechanics of DDD?
14     A.  Well, other than to say I'm continuously
15 reading on the subject.  To say when the last time I've
16 updated my literature review is, I can't give you that.
17     Q.  So when you were typing your report -- Let me
18 ask you.  Did you type your report, or do you dictate it
19 and have someone else do it?
20     A.  I dictate it.
21     Q.  And you would have dictated it on February
22 14th?
23     A.  No, no.  I would have dictated it before then.
24 I wouldn't have left it that late.
25     Q.  When you get to the section on biomechanics of

Page 64

1  DDD and you're holding your Dictaphone, do you say,
2  "Insert" -- what do you say?  "Insert section on
3  biomechanics of DDD"?  How do you do that?
4      A.  No.  I -- I don't dictate that.
5      Q.  What do you dictate?
6      A.  I -- I dictate my summary of the event.  I
7  dictate the summary of the medical.  I will dictate the
8  event reconstruction, and then when I come to start
9  dealing with specific issues, such as a torn rotator cuff
10 or a knee injury or a fracture or traumatic brain injury,
11 then I will do a literature search and create that
12 myself, and I will type that myself.
13          In this case, because so much of my work
14 is involving DDD, I have an ongoing literature review
15 that I keep up to date, and we use that on a repeated
16 basis.
17     Q.  I understand that, but when you were dictating
18 this report, for instance, after you said on the
19 preceding paragraph to the section on the biomechanics of
20 DDD -- ends with "In fact, Mr. Chavez was diagnosed with
21 cervical and trapezius strains.  These types of muscle
22 strains typically abate without medical treatment within
23 days," those would have been words that you were
24 dictating?
25     A.  No.

Charles Edward Bain, M.D.

Page 77

1  the '70s that could lift everything.
2         Without the use of some other mechanical
3  advantage, other than the handlebars, most ordinary folks
4  would need assistance in righting or placing the concrete
5  saw right side up if it were laying flat?
6     A.  For that weight that that saw was, that is
7  correct.
8     Q.  In fact, you said -- I think -- What did you
9  say? That you would break the handlebars before you got
10 it right side up?
11    A.  I don't believe that those handlebars could
12 withstand 1500 pounds of force.
13    Q.  So if somebody used a crane or some other
14 mechanical device to try to lift it from its -- lift it
15 up and place it right side up from the handlebars alone,
16 it would likely break the handlebars?
17    A.  I would think that it would damage them in some
18 manner, yes.
19    Q.  Could two people lift it up?
20    A.  Depends on the strength of those two
21 individuals.
22    Q.  What do you think the most likely thing is?
23 Two average-size males of average weight, could they lift
24 it up?
25    A.  Well, they're not lifting the entire machine

Page 78

1  up. You're going to tip it up, so you're not lifting
2  1500 pounds. Two individuals, they might be able to tip
3  it over upright on its wheels.
4     Q.  And you deal in medical and engineering
5  probabilities all the time, do you not?
6     A.  Yes.
7     Q.  So do you think it's medically and -- most
8  probable from a medical and engineering point of view
9  that two individuals could actually lift it up?
10    A.  Tip it up?
11    Q.  Yes.
12    A.  It's possible.
13    Q.  Not probable though?
14    A.  It depends on the individuals, depends on their
15 strength.
16    Q.  How about the two people in the photograph?
17    A.  I can't comment.
18    Q.  If for some reason the blade is not in the
19 ground and the saw begins to tip over. Accept that
20 hypothetical?
21    A.  Yes.
22    Q.  Somehow it gets out of balance and begins to
23 tip over?
24    A.  It's not going to get out of balance.
25    Q.  Why not?

Page 79

1     A.  To tip that saw over with the blade
2  hydraulically lifted, a force has to be applied to the
3  saw.
4     Q.  Well, let me ask you, in this case, you'll
5  agree that the saw did tip over?
6     A.  Based on testimony, yes.
7     Q.  When it tipped over, was the blade in the
8  ground, or was it lifted?
9     A.  We don't have any testimony in that regard. I
10 would assume it being -- it was lifted because of the saw
11 being backed up into the truck. I would think the blade
12 was lifted -- that the hydraulic device had been
13 actuated, the blade lifted out of the ground, and the saw
14 was being backed up when it struck the truck.
15    Q.  Can it be backed up while the blade is in the
16 ground?
17    A.  It may be able to. I think it would be
18 difficult, but it's possible.
19    Q.  You don't know whether -- You understand what
20 the purpose of the machine is, right?
21    A.  Yes, I do.
22    Q.  It's to make cuts in concrete?
23    A.  That's correct.
24    Q.  A few inches deep?
25    A.  Correct.

Page 80

1     Q.  To mark a construction work area?
2     A.  Or to cut the concrete to allow to it expand
3  and contract.
4     Q.  Sure.
5     A.  Expansion joint.
6     Q.  Do you know whether you can make those cuts
7  both in frontward and backward motion on this particular
8  machine?
9     A.  I don't know. All the machines I have seen
10 have been making them forward, and backwards is simply to
11 readjust the machine. You make the cut. You run it
12 backwards and redo the cut.
13    Q.  Have you ever operated a concrete saw cutter?
14    A.  No, I haven't.
15    Q.  Have you gone out and inspected an exemplar for
16 this case?
17    A.  I have seen one at Lowe's in their rental
18 section. I looked at it. That's all I did.
19    Q.  Was it the exact model that was used in this
20 case?
21    A.  No. It was a different one.
22    Q.  Do you know if it had the same component parts?
23    A.  I doubt it would.
24    Q.  Do you know if it weighed the same?
25    A.  No. This was a smaller one.

20 (Pages 77 to 80)

Page 81

1    Q.  So you haven't looked at a 1500-pound concrete
2  saw cutter to determine whether it can go forward and
3  backwards, have you?
4    A.  Well, it can go forwards and backwards.
5    Q.  I said forwards and backwards for purposes of
6  making the concrete saw cuts.
7    A.  Well, you hadn't mentioned that latter part,
8  but I don't know if you can cut going backwards.  From a
9  safety perspective, that saw is going to go in one
10 direction, and I would assume that's rotating so the
11 leading edge of the saw blade is going down for debris
12 purposes, and if you were to cut going the other way,
13 you'd have to reverse the saw blade, and I don't think
14 you can do that, but I don't know for sure.
15   Q.  So your opinion that the saw blade was in the
16 up position is based on your opinion that Mr. Chavez was
17 going backwards at the time of the impact with the
18 tractor?
19   A.  Well, Mr. Chavez definitely was going backward
20 when he was backing the tractor.  I would think that
21 likely he had the saw blade up, but I can't be certain
22 about that.
23   Q.  Well, with the saw blade up.  Let's use that as
24 the hypothetical.  With the saw blade up and the machine
25 tipping over, could a five-foot-six, 190-pound man keep

Page 82

1  the machine from tipping over?
2    A.  I doubt it.
3    Q.  Could two men?
4    A.  Well, it depends on what type of force is being
5  exerted on the machine and where in tipping it over.  You
6  would have to counter that force, and the force may be
7  too great for 20 people.
8    Q.  How many?
9    A.  For 20 people to counter.
10   Q.  So the force of the saw blade tipping over --
11 that would be the force of a 1500-pound machine falling
12 over -- might be, in your testimony, in your opinion, too
13 difficult for even 20 people to counter?
14   A.  Well, I think we're talking about different
15 things here.  I'm talking about the force that's applied
16 to the machine to tip it over.  That could be a very high
17 number, depending on the object that is causing it to tip
18 over.
19   Q.  Once the machine -- I'm sorry.  I didn't mean
20 to interrupt you.
21         MR. VALDEZ:  Excuse me.  Yes.  Please
22 finish answering, doctor.
23         THE WITNESS:  I've forgotten it already.
24   Q.  I apologize.  I'll try not to do that.
25   A.  Yeah.

Page 83

1    Q.  Assuming the machine has started to tip over,
2  once the machine starts to tip over, that has a force
3  itself, does it not?
4    A.  Once you take the vehicle's, the saw's, center
5  of gravity and move it so that it is now outside the
6  base, then it is going to tip over.  When that center of
7  gravity is right at the edge of the base, one man can
8  hold the machine up.
9    Q.  I understand that.
10   A.  When something's balanced, you don't need a lot
11 of force to hold it.
12   Q.  Once it leaves balance or equilibrium, then as
13 it descends, it has it own force, force being equal to
14 mass times acceleration?
15   A.  Well, it doesn't have its own force.  Gravity
16 is acting on it and accelerating it downward at a certain
17 rate, and it takes a certain amount of force to stop it,
18 and the amount of force is going to increase how quickly
19 you want to stop it, but as that's tipping over, it
20 becomes more and more difficult to rebalance it.
21   Q.  I understand.  Once it's past the balance
22 point, the mass accelerates to the ground, does it not?
23   A.  Yes.
24   Q.  And mass and acceleration is how you calculate
25 force?

Page 84

1    A.  Correct.
2    Q.  And to calculate --  How would you calculate
3  the force, the corresponding force, that would be
4  necessary to stop that acceleration; how would you do
5  that?
6    A.  Well, you have to look at the effective mass of
7  the saw at a certain point, and the effective mass when
8  it's balanced is very, very low.  Therefore, it doesn't
9  take a lot of force to hold it up, but as the saw tips
10 over and the center of gravity is moving away from that
11 tipping point, the effective mass becomes greater, and
12 then when it's horizontal, the effective mass is 1500
13 pounds or the weight of the saw, and then the force is
14 going to be required to lift it.
15   Q.  So can you calculate what the effective mass
16 was of this concrete saw cutter once it passed the center
17 of gravity and began to tip over?
18   A.  Yes, you can do that.  You need to know the
19 moment of inertia of the saw.  I haven't calculated that,
20 but the force is going to start at zero, and it's going
21 to increase to 1500 pounds.
22   Q.  And you've not done that in this case?
23   A.  I haven't calculated how much force there would
24 be at 45 degrees.  No, I have not.
25   Q.  How hard would it be to do that?

21 (Pages 81 to 84)

Page 85

1    A.   Once you get the moment of inertia of it, you
2  can put it into a mathematical formula to determine that.
3    Q.   And the moment of inertia is the moment that
4  the machine passes the center of gravity?
5    A.   No.
6    Q.   What would you define the moment of inertia to
7  be then?
8    A.   Basically, in layman's terms, it's the
9  distribution of the mass of the machine.
10   Q.   What do you mean by the -- That's still not
11 quite layman's terms for most folks.  What is the
12 distribution of the mass of the machine?
13   A.   I'm trying to think of an example.  If you take
14 an object that is like a pipe, it's going to have a
15 certain moment of inertia.  If you took that mass and
16 compressed it into a ball, its moment of inertia is going
17 to be different because it's a different shape.  It's
18 more compact.
19   Q.   Let's go again back to your dictated sections.
20 Did Mr. Chavez attempt to hold the saw up as it was
21 falling?
22   A.   The only person that states that is the person
23 who was acting as the foreman at the site, and that was
24 Mr. Ayala.  I don't think Mr. Chavez stated he tried to
25 hold the saw.

Page 86

1    Q.   Who was operating the saw?
2    A.   Mr. Chavez.
3    Q.   And you have the opinion that Mr. Chavez backed
4  the saw into the tractor?
5    A.   Yes.
6    Q.   What portion of the saw impacted the tractor?
7    A.   It will be one of the handles.
8    Q.   Which one?
9    A.   You could make a case for either one, but it
10 was one of the handles contacted the faring.
11   Q.   It's your job to make the case, since it's your
12 opinion, so I'm asking you to make the case.  What case
13 would you make for which handle impacted the tractor?
14        MR. VALDEZ:  Excuse me.  Object to the
15 argumentative portion of that question.
16        You can answer the balance of that
17 question, sir.
18        MR. JARAMILLO:  I'm going to object to
19 your speaking objection.
20        MR. VALDEZ:  It's not a speaking
21 objection.
22        MR. JARAMILLO:  Absolutely.
23        MR. VALDEZ:  If you're harassing him like
24 that, David, now --
25        MR. JARAMILLO:  There's no exception.

Page 87

1        MR. VALDEZ:  It's not his contention or
2  his position to do anything other than testify.
3        MR. JARAMILLO:  It absolutely is.  He's
4  an expert witness here.  He's here to make opinions.
5        MR. VALDEZ:  I'm the lawyer, and I'm
6  going to use his facts and opinions.
7        So please answer the balance of that
8  question, doctor.
9        MR. JARAMILLO:  No.  Again, Mr. Valdez,
10 with all due respect, that is entirely inappropriate, to
11 tell an expert witness what portion of a question to
12 answer, and if Judge Molzen calls, we'll add that to the
13 list.
14       MR. VALDEZ:  If it's an unclear question,
15 then he can't answer it.
16       MR. JARAMILLO:  The rules are abundantly
17 clear in our local district that you cannot do what
18 you're doing.
19       MR. VALDEZ:  They are very clear, sir.
20 They're very clear, and I'll ask you please to ask him a
21 fair and clear question.
22   Q.  You said you are of the opinion in this case
23 that my client, Mr. Herman Chavez, backed the concrete
24 saw cutter into Steve Stamper's tractor?
25   A.  Yes.

Page 88

1    Q.   So I need to know all the factual bases for
2  that opinion, and I need to know which --  And you
3  believe that the impact was likely with the handles?
4    A.   Yes.  One of the handles.
5    Q.   And there are two handles?
6    A.   Correct.
7    Q.   Which handle?
8    A.   I can't state which handle.  And it is not that
9  important to the fact that he had backed it into the
10 tractor-trailer.  You can make a case for it being the
11 left handle or the right handle.  The point is though,
12 based on the objective evidence, Mr. Chavez backed the
13 saw into the truck.
14   Q.   What is that objective evidence?
15   A.   It's based on the pictures of the
16 tractor-trailer.
17   Q.   What in the picture?  And again, we've marked
18 them 5A, B, C, D, E, so when you're referring to a
19 picture, I'd ask that you identify it.
20   A.   Picture 5D.
21   Q.   Let me stop there.  Of the five photos, is 5D
22 the photo that you relied upon?
23   A.   I relied upon them all, but I'm utilizing 5D
24 because it is the -- one of the clearest for giving to
25 you the basis for why I said it backed into it.  5B shows

Page 89

1    the same information.  5A shows the position of the truck
2    after this event, and 5E shows the truck again, although
3    just a little overexposed.
4        Q.  What characteristic of the photograph --  What
5    characteristics of the physical evidence in the
6    photograph supports your conclusion that Mr. Chavez --
7    one of the handlebars, either the left or the right,
8    backed in and caused that damage?
9        A.  The damage pattern that we see is a puncture,
10   and the handle punctured the gas tank faring, the
11   fiberglass, and when the truck then moved forward, we got
12   this splitting because of the loading being placed on
13   this.  You can see the puncture mark extends rearward.
14   As the truck's faring moved forward, the handle would
15   have been moved slightly rearward, reached the faring.
16   We get this cracking here.
17           Another thing is if this had happened
18   with the truck moving forward at any substantial
19   velocity, we would have seen scratch marks on the truck
20   from the handle running down the faring as it embedded
21   itself into this.  We don't see those horizontal
22   markings.  That tells me that this truck was going
23   either -- was either stopped or going incredibly slow
24   when the saw impacted it.
25       Q.  So let me back up then.  Your opinion is that

Page 90

1    the saw impacted the fuel tank faring --
2            It's fiberglass, right?
3        A.  Yes.
4        Q.  -- that the saw impacted the fuel tank faring
5    when it was either at a stop or at a near stop?
6        A.  Correct.
7        Q.  But that the physical evidence, namely, the
8    damage pattern, indicates that subsequent to the impact
9    between the fuel tank faring and the handlebar, the truck
10   moved forward?
11       A.  Correct.
12       Q.  And that's what causes the damage, looking at
13   the picture, leftward?
14       A.  Correct.
15       Q.  And the crack pattern?
16       A.  Yes.
17       Q.  So the truck was in motion during some part of
18   the impact between the handlebar and the fuel tank
19   fiberglass faring?
20       A.  Yes.  Once these two vehicles became engaged,
21   the tractor-trailer moved forward, tipping the saw over.
22       Q.  How fast can a five-foot-six, 190-pound man
23   move a 1500-pound concrete saw backwards; how fast can
24   someone do that?
25       A.  Well, he can't control the speed.  You have a

Page 91

1    lever on it that you activate it forward to move the saw
2    forward and bring it rearward to move the saw rearward.
3    These vehicles operate with a motor operating at full
4    rpm, and then you activate the lever.  This is not --
5    Mr. Chavez is not pushing the saw manually.  This saw is
6    being driven by a motor.
7        Q.  Thank you for clarifying that.  So given the
8    way the motor operated on this concrete saw cutter,
9    you're of the opinion that Mr. Chavez was not manually
10   moving the concrete saw backwards?
11       A.  He had activated the -- what do you call it --
12   the transmission and causing the saw to move rearward.
13       Q.  So he put it in reverse?
14       A.  He put it in reverse, exactly.
15       Q.  So can a concrete saw cutter such as this be
16   moved backwards manually without the engine being -- or
17   the engine and the transmission being engaged?
18       A.  I think it would be difficult to do that, but
19   I'm sure a strong person could do that.
20       Q.  How fast would a strong person be able to move
21   such a device?  Fairly slowly?
22       A.  Depends how strong they are.  I don't know.
23       Q.  Could they move it with sufficient force to
24   puncture a fiberglass fuel tank faring?
25       A.  I doubt that.  I doubt that.

Page 92

1        Q.  So your opinion is that the lever was placed in
2    reverse while the engine was engaged and the engine
3    propelled the concrete saw cutter backward?
4        A.  Into the truck, yes.
5        Q.  How fast was that moving?
6        A.  I've seen videos of these machines operating.
7    They're very slow.  They're a very slow walk.  A normal
8    fast walk is three miles an hour.  These machines are
9    probably operating at less than a mile an hour.
10       Q.  So even with the engine and transmission
11   engaged and placed in reverse, this 1500-pound concrete
12   saw cutter was moving backwards at less than a mile an
13   hour?
14       A.  That's an estimate, yes.  It was moving
15   rearward very slowly compared to what you and I can walk
16   at a brisk pace.
17       Q.  Are you of the opinion that it was moving
18   rearward with sufficient force to puncture the fiberglass
19   faring cover?
20       A.  Well, the machine is going to drive it
21   rearward, and we have a handlebar with a blunt end that
22   is very easily going to puncture a fiberglass faring.
23       Q.  Have you ever inspected the handlebar?
24       A.  No.
25       Q.  Do you know if there's any damage to the

23 (Pages 89 to 92)

Charles Edward Bain, M.D.

Page 93

1  handlebar consistent with it puncturing the fiberglass
2  faring cover?
3     A.  I don't know.  I wouldn't expect to see any.  I
4  might see some blue paint transfer on the end of the
5  handlebar, but I wouldn't -- from it puncturing the
6  faring, I wouldn't expect to see it damaged.
7     Q.  Well, let me ask you, we have a 1500-pound
8  concrete saw cutter moving at the greatest speed being
9  less than a mile an hour, correct?
10    A.  Most likely.
11    Q.  At the point of impact.  Would you agree?
12    A.  Yes.
13    Q.  The other vehicle is the Marten Transport
14 tractor-trailer, correct?
15    A.  Yes.
16    Q.  And what's the weight of that?  What was the
17 weight of that vehicle?
18    A.  The tractor's curb weight was 15,769 pounds.
19 The dry weight of the trailer was 14,500, and it was
20 carrying a load of 37,298 pounds for a total weight of
21 sixty-seven thousand pounds seven hundred and forty-seven
22 (sic).  That's including the driver.
23    Q.  Since you're referring to this document, you're
24 talking about trailer information?
25    A.  It's a document called "Vehicle Information,"

Page 94

1  vehicle and trailer information.
2     Q.  So including the tractor, the trailer, the load
3  and Mr. Stamper, the Marten Transport vehicle was about
4  68,000 pounds?
5     A.  Yes.
6     Q.  Let's just call it exactly what it is.  We have
7  by your numbers 67,747 on the Marten side?
8     A.  That's assuming it's got full gas tanks.
9     Q.  And we have 1,790 pounds on the
10 Herman-Chavez-concrete-saw side?
11    A.  Actually, no.  My staff have given the weight
12 of 1600 pounds in this document, and the saw is 500
13 pounds.  They've also added Mr. Chavez's weight into
14 this, and that's not correct.  The weight of the saw is
15 1500 pounds.
16    Q.  You misspoke.  You said the -- So the weight
17 of the saw, they shouldn't have added Mr. Chavez's
18 weight?
19    A.  Correct.
20    Q.  So you have 67,747.  You have a -- I'm sorry.
21 You have a 1500-pound device and a sixty-seven-thousand
22 pound device?
23    A.  That's correct.
24    Q.  What's that ratio work out to?
25    A.  Around 50 to one, maybe a little less than

Page 95

1  that.
2     Q.  So the tractor-trailer outweighed the concrete
3  saw by 50 to one?
4     A.  In that range, yes.
5     Q.  And how fast was -- You said -- Assuming it
6  was at a complete stop, how fast was the tractor-trailer
7  accelerating after the point of impact?
8     A.  A loaded tractor-trailer can accelerate at
9  around .05 g.
10    Q.  How many miles an hour is that?
11    A.  Well, that's an acceleration rate.  That's not
12 speed.
13    Q.  Let's get speed.  I'm sorry.  Speed.  Give me
14 the speed of the tractor-trailer after the point of
15 impact.
16    A.  After the point of impact?
17    Q.  Sure.
18    A.  What I can do is give -- Mr. Stamper stated he
19 moved forward three to six feet, when he heard a noise.
20 I -- At a .05 acceleration rate, I can give you the
21 speed after six feet if that's what you want me to do.
22    Q.  Sure.
23       MR. VALDEZ:  What do you need?
24       THE WITNESS:  I need a calculator.
25       MR. VALDEZ:  Do you have one?

Page 96

1        THE WITNESS:  Yes.
2     Q.  I was going to give you my phone, but if you
3  have one --
4     A.  I've got one too.  And I need a pen.  Actually,
5  I can just -- You don't mind if I reference the
6  spreadsheet on my computer?
7     Q.  Sure.
8     A.  That will make it a lot quicker.
9        A vehicle accelerating at .05 g will be
10 going 2.1 miles per hour after three feet and essentially
11 three miles an hour after six feet, assuming a constant
12 acceleration over that distance.
13    Q.  So when it was in motion, the
14 sixty-seven-thousand-pound tractor-trailer was going
15 between two and three miles an hour over the first ten
16 feet?
17    A.  Over the first three to six feet.
18    Q.  Over the first three to six feet.  And the
19 1500-pound concrete saw cutter would have been going less
20 than one mile an hour?
21    A.  As it was backing up.  We don't know whether
22 Mr. Chavez stopped the saw at some point.
23    Q.  You've said that one of the things that you've
24 done in this case was come to a reconstruction opinion,
25 namely, that Mr. Chavez backed the saw into the

24 (Pages 93 to 96)

Herman J. Chavez v. Marten Transport, Ltd., et al.                                                                    1955

Page 97

1 fiberglass fuel cover. Other than the photographic
2 evidence that you've pointed to, what other objective
3 evidence is there to support that opinion?
4     A. That is entirely objective, not relying on
5 people's testimony?
6     Q. Correct.
7     A. It is the damage pattern we see to the
8 tractor-trailer.
9     Q. Anything else?
10    A. That is objective?
11    Q. Correct.
12    A. No.
13    Q. Is it based on any site inspection that you've
14 done?
15    A. No.
16    Q. Any measurements of the scene?
17    A. No.
18    Q. Any recreation that you've done?
19    A. I haven't done an animation or -- nothing like
20 that.
21    Q. Any inspection of the actual concrete saw
22 cutter?
23    A. I did not do that.
24    Q. Any inspection of an exemplar?
25    A. Other than watching a video clip of one being

Page 98

1 operated, no.
2     Q. When did you watch that video clip?
3     A. Oh, it was several weeks ago.
4     Q. Do you have that video clip in any of the
5 documents that you've produced to our clients today?
6     A. No.
7     Q. Did you do any testing on the fiberglass
8 material that was punctured?
9     A. No, I did not.
10    Q. Are you relying in any way on J. T. Hayes's
11 accident reconstruction?
12    A. No, I'm not.
13    Q. So the only subjective -- I'm sorry. The only
14 objective physical evidence or evidence of any kind is
15 the photographic evidence that you've shown us?
16    A. That is the only objective evidence.
17    Q. Is there subjective evidence that you are
18 relying upon to come to this or to support this opinion
19 that Mr. Chavez backed into the tractor?
20    A. We have various descriptions from various
21 individuals as to what happened. I think Mr. Chavez
22 states he was between the handlebars operating the
23 machinery, and the truck hit the concrete saw, which is
24 completely incorrect. That would have meant the truck
25 hit Mr. Chavez. There's no testimony in that regard.

Page 99

1     That would also have meant Mr. Chavez was
2 between the handlebars, and as the saw fell over, he
3 would have been contacted by the handles and knocked to
4 the ground. There's no testimony that that happened.
5     That would also imply then that the front
6 of the tractor-trailer hit the saw, and there's no
7 evidence that that happened. We have this damage pattern
8 that is in the vicinity of the gas tank on the right
9 side.
10    So Mr. Chavez's scenario is wrong on
11 numerous accounts.
12    Q. Other than your interpretation and your opinion
13 that Mr. Chavez's subjective description of the events is
14 wrong, what other subjective evidence do you have to
15 support your opinion?
16    A. Mr. Stamper stated that two individuals with a
17 saw had crossed in front of him and that at some point,
18 he started moving forward, and then after this three to
19 six feet, he heard a bang, which supports the fact that
20 the saw was -- passed rearward of the front of his
21 vehicle.
22    Mr. Ayala states something very similar
23 to that. He states that Mr. Sepulveda and Mr. Chavez
24 were on the west side when the event happened, and the
25 saw was knocked over. We see where the damage pattern

Page 100

1 is. That really only dictates one scenario allowing this
2 to happen.
3     Q. Anything else?
4     A. No.
5     Q. Can the concrete saw cutter self-propel itself
6 backwards?
7     A. If the lever is left in the reverse position?
8     Q. Yes.
9     A. Now, I would have to clarify that. I don't
10 know if that lever is spring-loaded to the neutral
11 position. I would have -- I haven't operated one to see
12 if you actually have to keep your hand on it.
13    Q. Do you know --
14    A. In the video, the individual had their hand on
15 that lever the whole time.
16    Q. Again, this is the video that's not disclosed
17 in your report or even produced to my client here today?
18    A. That's correct.
19    MR. JARAMILLO: Well, just for the
20 record, we're going to move to strike any reference to
21 that video, so I need --
22    Q. Other than the video, do you have any --
23    MR. VALDEZ: Excuse me. If you're making
24 comments as to the record, as to the record, we'll oppose
25 that.

25 (Pages 97 to 100)